## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| SAMUEL BACK, on Behalf of Himself and All Others Similarly-Situated, | ) ) ) ) | **PROPOSED COLLECTIVE ACTION UNDER FLSA AND CLASS ACTION UNDER KWHA** |
| *Plaintiff,* | ) ) | |
| v. | ) ) | CASE NO.    4:22-cv-5-RGJ |
| RAY JONES TRUCKING, INC., TERESA JONES, GRANT JONES and STEVEN JONES, | ) ) ) ) | **JURY DEMANDED** |
| *Defendants.* | ) ) | |

## MOTION FOR RULE 23 CLASS CERTIFICATION

Comes Plaintiff Samuel Back, by and through counsel, and moves the Court to certify a Rule 23 class composed of the following persons:

> All persons employed as a truck driver by Ray Jones Trucking, Inc. who worked, according to daily sheets maintained by Ray Jones Trucking, Inc., more than forty hours in one or more workweeks for which the payday for such workweek(s) fell on or after January 10, 2017.

Plaintiff further moves that he be appointed as class representative and that the undersigned be appointed as class counsel. For grounds, Plaintiff would show that Plaintiff and the proposed class are similarly situated with respect to Plaintiff's claims that Defendants violated the Kentucky Wages and Hours Act by not paying employees overtime compensation for work in excess of forty hours in a workweek. Defendant's own documents, discovery responses, and representations under penalty of perjury to the United States Federal Motor Carriers Safety Administration all support that members of the proposed class are similarly situated with respect to Plaintiff's claim under the Kentucky Wages and Hours Act that Defendant improperly classified drivers as exempt under the Motor Carriers Act exemption. The common issues support class action treatment.

## I.    Introduction.

Defendant operates a trucking company.  Boiled down to the essence, Defendant does not deny that Defendant's numerous truck driver employees worked overtime and that Defendant did not pay them overtime compensation. Instead, Defendant claims it is a trucking company operating in interstate commerce and that every one of its drivers is also operating in interstate commerce. Therefore, Defendant asserts that the Motor Carrier's Act exemption applies.  However, the application of facts and law common to all Defenant's drivers demonstrates that drivers are eligible for overtime compensation and that Defendant's exemption assertions are incorrect.  Thus, the drivers' response to Defendants' exemption arguments (which are Defendants' only real attempt at a defense) are based on common-across-the-class facts and law, and a class action would be superior than individualized litigation of the drivers' claims.

## II.    The Rule 23 Standard.

Rule 23 class certification is a different issue than, and follows different procedures and standards from, questions of whether notice should be issued to similarly-situated persons under the FLSA,[1] or whether persons who consent to join an FLSA action should be permitted to continue proceed as a collective action.[2]  *Clark v. A&L Homecare & Training Ctr., LLC*, 68 F.4th 1003, 1009 (6th Cir. 2023) ("class actions under Rule 23 'are fundamentally different from collective actions under the FLSA'"), quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 74, 133

---

[1]    This issue was historically referred to as "FLSA conditional certification," but the Sixth Circuit in *Clark* disapproved the use of this term.

[2]    This issue was historically referred to as "FLSA de-certification."  *Clark* did not involve this issue, and it is unclear whether the Sixth Circuit in *Clark*, by expressing disapproval of the term "conditional certification, expressed disapproval of the term" de-certification."  In any event, it is clear that similarly-situated employees come before the Court by different mechanisms under Rule 23 than they do under the FLSA.  Under the FLSA, the similarly-situated employees join the action (or "opt-in") by filing a consent with the Court.  See 29 U.S.C. §§ 216(b), 256.  In contrast, a member of a proposed Rule 23 class only becomes a party if the Court certifies the class, and is then a party without the need to affirmatively "opt-in."

S.Ct. 1523, 185 L.Ed.2d 636 (2013).  A party seeking Rule 23 class certification may not merely follow the FLSA process.  *Id.*

Instead, under Rule 23, a plaintiff must show that "the four prerequisites of Rule 23(a)" – numerosity, commonality, typicality, and adequate representation – are satisfied, and "the proposed class must also meet at least one of the three requirements listed in Rule 23(b)." *Glazer v. Whirlpool Corp. (In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.)* (hereafter "*In re Whirlpool*"), 722 F.3d 838, 850 (6th Cir. 2013);

"Rule [23] erects four threshold safeguards [for class actions]: numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a). Satisfying the Rule requires a named plaintiff to "affirmatively demonstrate" and offer '[s]ignificant' evidentiary proof that he can meet all four of those criteria, where they are contested.  *In Re Ford Motor Co*., 86 F.4th 723, 726 (6th Cir. 2023), *citing Doster v. Kendall*, 54 F.4th 398, 432 (6th Cir. 2022) (quoting *Wal-Mart*, 564 U.S. at 353, 131 S.Ct. 2541) and *Comcast Corp. v. Behrend*, 569 U.S. 27, 33, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013).  The Court "should not certify a class unless its 'rigorous analysis' shows that not one or two, but all four Rule 23(a) prerequisites are met." *Id.*, *citing Davis v. Cintas Corp.*, 717 F.3d 476, 484 (6th Cir. 2013) (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)).  Generally, a district court enjoys broad discretion to decide whether class certification is appropriate. *Id. at* 727.

In addition to meeting the requirements of Rule 23(a), "the proposed class must also meet at least one of the three requirements listed in Rule 23(b)."  *In re Whirlpool*, 722 F.3d 838, 850 (6th Cir. 2013).  Rule 23(b)(1)(A) is met where "prosecuting separate actions by… individual class members would create a risk of:… inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the

class." Rule 23(b)(3) "requires the district court to find that the questions of law or fact common to class members predominate over any questions affecting only individual members and that the class action is superior to other available methods' to adjudicate the controversy fairly and efficiently." *In re Whirpool*, 722 F.3d 838, 850 (6th Cir. 2013).

While the meat of the analysis in this matter will likely center upon the commonality question under Rule 23(a)(2) (addressed in Section V beginning at page 7 below), Plaintiff addresses each Rule 23 element in turn below.

### III.    The Class is Ascertainable.

Though it is not an express requirement of Rule 23(a), "the class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Rapp v. Forest City Techs., Inc.*, 2021 WL 2982005, at *6 (N.D. Ohio July 15, 2021), quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537-38 (6th Cir. 2012) (quotation marks and citation omitted).  The purpose of this requirement is to avoid creation of classes that are vague, or whose members cannot be identified until further adjudications are made (including so-called "fail-safe" classes that are effectively defined as those persons to whom a defendant is liable, begging the ultimate question).  *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012)

In wage and hour matters such as the present one, ascertainability is generally easily established as the FLSA and state law generally require employers to maintain records identifying their employees. *Rapp v. Forest City Techs., Inc.*, No. 1:20-CV-2059, 2021 WL 2982005, at *6, 29 U.S.C. § 211(c); 29 C.F.R. §§ 516.2, 516.5, 516.6, 516.7; K.R.S. § 337.320.

Here, Defendant maintained records identifying each of its truck driver employees.  More particularly, Defendant, in order to keep track of which loads were driven by which drivers and be

able to pay drivers, had drivers record their loads driven on a "daily sheet." This document also included a section for the hours driven by the driver to be recorded (Kentucky state law requires drivers registered as intrastate only to have drivers record the hours that they began and stopped working every day in order for the Kentucky Department of Transportation to regulate whether or not the company is having the driver drive more hours in a day than is permitted by law, see 601 K.A.R. 1:005, § 2, adopting for "intrastate" drivers requirements of "49 C.F.R. 395, Hours of Service of Drivers").

Therefore, Defendant's own records for each driver reflect that the driver worked a particular number of hours on each day worked. By adding the days within a work week, the total number of hours reflected on Defendant's records for the drivers work week can be computed, and the identity of Defendant's drivers who worked more than 40 hours can be ascertained from the literally thousands of such work weeks in the records of Defendants. For example, documents (daily sheets, payroll summaries, and paystubs) from Defendant illustrating workweeks in which overtime was worked (according to Defendants' own records) by numerous drivers are attached[3] as Exhibits 1 through 117.

Because Defendants have these records for each employee, there will not be difficulty in establishing whether or not a given person was or was not an employee during the relevant period. Accordingly, the proposed class meets the implicit ascertainability requirement.

## IV.    The Class is Numerous.

The first explicit requirement of Rule 23(a) is that the class be so numerous that joinder of all members would be "impracticable." Here, "'[i]mpractical' does not mean 'impossible,' and a plaintiff only need establish the difficulty or inconvenience of joining all members of the class to

---

[3]    Exhibits referenced in this motion are attached to the notices of filing exhibits filed concurrently herewith.

meet the numerosity requirement." *See Union P. R. Co. v Woodahl,* 308 F Supp 1002 (D. Mon. 1970). The "modest financial resources" of the proposed class members can be considered in assessing the practicality of joinder. *Zelaya v. Hammer*, 342 F.R.D. 426, 433 (E.D. Tenn. 2022).

While "[t]here is no strict numerical test[4] to determine whether the class is large enough or its members too numerous to be properly joined; the Sixth Circuit has previously held that a class of thirty-five[5] was sufficient to meet the numerosity requirement." *Est. of Pilgrim v. Gen. Motors LLC*, 344 F.R.D. 381, 399 (E.D. Mich. 2023), *citing Afro Am. Patrolmen's League v. Duck*, 503 F.2d 294, 298 (6th Cir. 1974).

Here, Defendant has reported on its MCS-150 forms before and throughout the class period the number of drivers it employed. Specifically, Defendant reported on MSC-150 forms it had the following number of "intrastate" drivers on the following dates, as reflected in the Ct Doc. 34-1:

| Date | Number of "Intrastate" Drivers |
|------|-------------------------------|
| 4/26/2016 | 46 |
| 3/29/2018 | 42 |
| 5/12/2020 | 23 |
| 4/26/2022 | 16 |

---

[4]      *Golden v. City of Columbus*, 404 F.3d 950, 965-66 (6th Cir. 2005) ("while the exact number of class members need not be pleaded or proved, impracticability of joinder must be positively shown, and cannot be speculative"); *Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir. 1989) ("plaintiffs are not required to specify the exact number of persons in the class").

[5]      *See also Kuchar v. Saber Healthcare Holdings LLC*, 340 F.R.D. 115, 120 (N.D. Ohio 2021) ("[g]enerally, a class with less than 20 members does not meet numerosity requirements, while a class of greater than 40 members is sufficient"), *citing* William B. Rubenstein, *Newberg on Class Actions* § 3.12 (5th ed.); *Wurts v. 32nd Street Used Tires, Inc.,* No. 0:22-cv-66, Ct. Doc. 29 (E.D. Ky. September 11, 2023) (approving Rule 23 settlement class of 32 employees (after opt-outs) of used tire retailer (see Ct. Doc. 27 in same matter at 9-10)); *Orr v. Shicker*, 953 F.3d 490, 498 (7th Cir. 2020) ("a forty-member class is often regarded as sufficient to meet the numerosity requirement"); *Rapp v. Forest City Techs., Inc.*, No. 1:20-CV-2059, 2021 WL 2982005, at *7 (N.D. Ohio July 15, 2021) ("Often, 'a class of 40 or more members is sufficient to meet the numerosity requirement.'") (quoting *Castillo v. Morales, Inc.*, 302 F.R.D. 480, 487 (S.D. Ohio 2014) (*itself quoting Snelling v. ATC Healthcare Servs. Inc.*, No. 2:11-CV-00983, 2012 U.S. Dist. LEXIS 172052, 2012 WL 6042839, at *5 (S.D. Ohio Dec. 4, 2012))).

Accordingly, a starting point for the size of the class is 42 drivers; that is, the 42 drivers Defendant asserted on its March 29, 2018 MCS-150 it employed at that time.[6]  However, of course, the actual number in the class is higher than 42, as not all drivers remained employed throughout the entire class period.  For instance, based on a review of records produced by Defendant for the period from December, 2016 through October, 2022 alone, workweeks for a total of 52 employees of Defendant are attached in Exhibits 1 through 117.  Accordingly, the class is at least 52 members, although normal assumptions about driver turnover indicate it could be higher.[7]

Finally, as a result of the closure of the Pride Mine operated by American Consolidated Natural Resources ("ACNR"), which was Defendant's only coal-hauling customer, Defendant has recently shut its coal-hauling operations, laying off numerous employees.[8]  In addition to this financial hit further limiting the class members' already-limited ability to fund individualized litigation (see pay amounts in Exhibits 1-117), employees will likely seek other employment, potentially in other locations, which will make individualized litigation even less practical.

Under these circumstances, joinder of all of the numerous drivers in the proposed class would be impracticable, and the numerosity requirement has been satisfied.

## V.    The Proposed Class Claims Share Commonality

### A.    The Applicability of the KWHA and Establishment of Overtime Claim

---

[6]    Defendant scheduled truck drivers to drive coal Monday through Friday, and sometimes also on Saturday, and the daily sheets reflect that drivers generally were working more than eight hours per day.  See Exhibits 1 through 117 (daily sheets reflecting hours per day, generally more than eight hours per day).  Therefore, every driver that drove for any appreciable period of time would likely have overtime hours.

[7]    *See Generation Changers Church v. Church Mut. Ins. Co.*, No. 3:21-CV-00764, 2023 WL 6206152, at *8 (M.D. Tenn. Sept. 22, 2023) ("[a] plaintiff must show some evidence of or reasonably estimate the number of class members, and, in assessing numerosity, the court may make common sense assumptions without the need for precise quantification of the class").

[8]    See "Pride Mine Closing in Muhlenberg County", attached as Exhibit 118 (also available online at https://www.14news.com/2024/02/29/pride-mine-closing-muhlenberg-co/).

All of the drivers' KWHA claims are based on common facts and law.  Unlike the FLSA, under which the applicability of the FLSA sometimes depends on the type of work done by the employee or the employer's "enterprise coverage" status, the KWHA applies to any "employer" who employs "employees."  Compare K.R.S. 337.285 and 29 U.S.C. § 207(a).  There is no dispute that Defendant Ray Jones Trucking, Inc. is the employer of the employees that form the class. It is thus required to pay them overtime, unless it can show that it is exempt under Kentucky's Motor Carrier Act exemption (see Section V(B) below).

The employees' proof on the overtime claims is similarly common.  By definition, the members of the class each worked more than forty hours – according to Defendant's own documents – in one or more workweeks.  Defendants do not even contest this, or attempt to show that Defendants paid employees overtime compensation for their overtime work. See Amended Answer, Ct. Doc. 22, at ¶ 50-54 (admitting that "paid the drivers based upon a formula that was derived from the amount paid to Defendant Ray Jones Trucking by its customers," that Plaintiff and "some of the other drivers worked more than forty hours in a workweek" and "that [Defendants] did not pay Plaintiff Samuel Back or any other truck drivers a different rate when he worked more than forty hours in a workweek"); see also Deposition of Grant Jones, Exhibit 119, at 53 (Defendant did not pay overtime), 56 (Defendant's truck drivers worked overtime in some weeks).  Instead, Defendant relies solely on the MCA exemption.

Further, questions of whether or not the individual defendants' control Ray Jones Trucking, Inc.'s decision to not employees pay overtime are similarly entity-wide questions that turn on circumstances apart from any individual circumstance of any particular employee.  *See Williams v. King Bee Delivery, LLC*, 199 F. Supp. 3d 1175, 1180–81 (E.D. Ky. 2016) (defendant may be liable under FLSA with employer as joint employer where defendant has "(1) exercise of the

authority to hire, fire, and discipline; (2) control over pay and insurance; (3) and supervision"); *Mouanda v. Jani-King Int'l*, 653 S.W.3d 65, 73 (Ky. 2022) (FLSA, as "analogue," relevant in assessing whether defendant is liable as "employer"); Grant Jones Deposition, Exhibit 119, at 10 (individual defendants each own 1/3 of Defendant Ray Jones Trucking, Inc.), 57-58 (individual defendants could make decision to pay overtime without consulting anyone else).

With respect to damages, the issues are also common.  Although tedious, the process of inputting handwritten content regarding the number of hours shown on Defendant's daily sheets for each employee, correlating the total hours in each week to the amount paid that employee for that week to generate a base hourly rate of pay, and determining the amount of unpaid overtime premium compensation is a mathematical process, which will apply in the same manner (although with different numbers) for each driver, unless the Motor Carrier's Act exemption applies.  See K.R.S. 337.285 (overtime rate of pay is "compensation …at a rate of not less than one and one-half (1-1/2) times the hourly wage rate at which he is employed).  See *Rapp v. Forest City Techs., Inc.*, No. 1:20-CV-2059, 2021 WL 2982005, at *4 (N.D. Ohio July 15, 2021) (plaintiffs sufficiently established commonality where they "filed records showing instances in which" overtime violation (in *Rapp*, a regular rate violation) occurred).

**B.    Drivers' Response to Defendant's MCA Exemption Arguments Share Commonality.**

Further, while slightly more complicated than the initial overtime analysis, Defendant's stated intention to pursue a Motor Carrier's Act exemption defense makes the drivers' claims that will be the subject of the action, if anything, *more* unified by common facts and law.

**1.    The MCA Exemption Standard.**

The Motor Carrier's Act exemption of the Kentucky Wages and Hours Act specifically adopts the Federal Motor Carriers Act exemption to the FLSA.  K.R.S. § 337.285(2)(c) ("[t]his

provision shall not apply to the following:… (c) Employees as defined and exempted from the overtime provision of the Fair Labor Standards Act in Sections 213(b)(1).. of Title 29, U.S.C."); *see also Hughes v. UPS Supply Chain Sols., Inc.*, 677 S.W.3d 273, 281 (Ky. 2023) (Kentucky Wages and Hours Act is generally "Kentucky's analogue to the Fair Labor Standards Act"), citing *City of Louisville, Div. of Fire v. Fire Serv. Managers Ass'n ex rel. Kaelin*, 212 S.W.3d 89, 92 (Ky. 2006).

In order to benefit from the Motor Carrier's Act exemption, the employer must bear the burden of proving that an exemption applies. *Sec'y of Labor v. Timberline South, LLC*, 925 F.3d 838, 850 (6th Cir. 2019) ("[t]he employer bears the burden of proving that it qualifies for a claimed exemption"). In order to establish that an exemption applies, the employer must make two separate showings: one relating to (A) "the class to which [the] employer belongs" and another (B) "on the class of work involved in the employee's job." 29 C.F.R. § 782.2

Specifically, this Court previously succinctly explained the Motor Carrier's Act exemption to the FLSA:

> the FLSA does not apply to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service." 29 U.S.C. § 213(b)(1). This exemption is known as the MCA exemption. The Secretary of Transportation possesses the power to regulate an employee if (1) the employee works for a motor private carrier that transports property in interstate commerce and (2) the employee's work activities "affect the safety of operation of" motor vehicles in interstate commerce. Sec'y of Labor v. Timberline South, LLC, 925 F.3d 838, 850 (6th Cir. 2019); 29 C.F.R. § 782.2(a); see 49 U.S.C. §§ 31502(b)(2); 13102(15).

*McClurg v. Dallas Jones Enterprises Inc.*, 542 F. Supp. 3d 595, 598 (W.D. Ky. 2021)

### 2.    Drivers' Claims that Defendant Is Not an Interstate Carrier Share Commonality.

An employer asserting the Motor Carrier Act exemption must establish that they are a "motor carrier" or "'motor private carrier,' defined as a person who transports property or goods

in interstate commerce. 49 U.S.C. § 13102(15)." *Sec'y of Lab. v. Timberline S., LLC*, 925 F.3d 838, 849 (6th Cir. 2019) 29 C.F.R. § 782.2 ("[t]he power of the Secretary of Transportation to establish maximum hours and qualifications of service of employees, on which exemption depends, extends to those classes of employees and those only who:… [a]re employed by carriers whose transportation of passengers or property by motor vehicle is subject to his jurisdiction under section 204 of the Motor Carrier Act (*Boutell v. Walling*, 327 U.S. 463; *Walling v. Casale*, 51 F. Supp. 520; and see *Ex parte Nos. MC–2 and MC–3, in the Matter of Maximum Hours of Service of Motor Carrier Employees*, 28 M.C.C. 125, 132)")

In other words, "[f]irst, the… employer… must be a motor vehicle carrier subject to the Secretary's jurisdiction-i.e., a carrier engaged in interstate or foreign commerce." Flowers v. Regency Transp., Inc., 535 F. Supp. 2d 765, 767 (S.D. Miss. 2008), *citing Lieberman v. Corporate Connection,* No. 03–CIV–22814, 2005 WL 5501491, at 1 (S.D.Fla.2005) (the "Secretary of Transportation only has jurisdiction over *interstate* transportation.... Only if the Defendant is taking part in interstate commerce can it be subject to the regulations of the Secretary of Transportation, and thereby protected by the Motor Carrier Act").

Further, even where a carrier does engage in a small amount of interstate commerce hauling, it must show that this hauling is more than *de minimis* to invoke the protection of the Motor Carrier Act exemption as "the Secretary [of Transportation] cannot exercise jurisdiction over a motor carrier whose interstate activities represent only a de minimis percentage of its overall activities." *Mowdy v. Beneto Bulk Transp.*, No. C 06-05682 MHP, 2010 WL 11706895, at *8 (N.D. Cal. July 8, 2010) (collecting cases[9]).

---

[9]    *See Morris v. McComb*, 332 U.S. 422, 431-36 (1947) (holding that where 4% motor carrier's drivers' trips were interstate, both prongs of the MCA exemption analysis were satisfied); *Flowers v. Regency Transp., Inc.*, 535 F. Supp. 2d 765, 769 (S.D. Miss. 2008) ("If the employer['s] ... involvement in interstate commerce could be characterized as de minimus, [sic] they may not be subject to the Secretary of Transportation's jurisdiction at all, and

Fortunately for Plaintiff, Defendant itself answered the question of whether or not it is an interstate carrier, and did so in Plaintiff's favor.  Specifically, under Kentucky law, like the law of other states, all trucking companies, whether they operate in interstate commerce (discussed in much greater detail below) or not, are required to obtain a United States Department of Transportation number.[10]  601 K.A.R. 1:005, § 4(4). While federal law only requires trucking companies involved in interstate commerce to obtain such a number, federal law allows trucking companies *not* involved in interstate commerce to obtain such a number in order to comply with state law.  It does so with a form, entitled MCS-150.  See Form MCS-150, attached as Exhibit 120.

"The instructions to Section 22 of Form MCS-150 (as revised December 13, 2020) expressly stated that a company should check "Interstate Carrier" under the following circumstances:

> A.    Interstate Carrier – The company is an Interstate Carrier if any part of its operation transports property or passengers in support of interstate commerce, i.e., the property or passengers cross State lines either before the company received them, while the company is transporting them, or after the company has transferred

---

thus are not covered by the Motor Carrier Act."); *Garcia v. Fleetwood Limousine, Inc.*, 511 F. Supp. 2d 1233, 1240 (M.D. Fla. 2007) (examining the percentage of interstate business in deciding "whether [defendant] was engaged in interstate transportation"); *Rossi v. Associated Limousine Services, Inc.*, 438 F. Supp. 2d 1354, 1361 (S.D. Fla. 2006) ("[T]he FLSA holds that the Secretary of Transportation has the power to set maximum hours for drivers if the company engages in more than de minimi [sic] interstate commerce which includes a company that holds itself out as an interstate company and solicits that business even though its prospect of obtaining such business is poor and some of its drivers never drive in interstate commerce."); *Peraro ex rel. Castro v. Chemlawn Services Corp.*, 692 F. Supp. 109, 114 (D. Conn. 1988) ("The Secretary's power wanes, and the employer's section 213(b) exemption consequently fades, ... when the employer's interstate activities affecting the safety of interstate motor operations are de minimis."); *Kimball v. Goodyear Tire and Rubber Co.*, 504 F. Supp. 544, 548-49 (D. Tex. 1980) (holding that where interstate trips constituted .17% of all trips, MCA exemption did not apply); *Coleman v. Jiffy June Farms, Inc.*, 324 F. Supp. 664, 669 (D. Ala. 1970) (holding that where interstate hauls generated only .23% of motor carrier's revenue that MCA exemption did not apply).

[10]    Many states, including Kentucky, require such intrastate companies to obtain a federal DOT number.  See Kentucky Transportation Cabinet "Intrastate Carriers" webpage, Ct. Doc. 33-2 (also available online at https://drive.ky.gov/motor-carriers/Pages/Intrastate-Carrier.aspx) (last checked March 28, 2024); *see also D'Arpa v. Runway Towing Corp.*, 2013 WL 3010810 (E.D.N.Y. 2013) ("in certain states, including New York, 'all registrants of commercial motor vehicles, *even intrastate* and non-Motor Carrier registrants, are required to obtain a USDOT Number as a necessary condition for commercial vehicle registration") (emphasis that of *D'Arpa* court), citing FMCSA website; *Do I Need a USDOT Number?*, FMCSA, U.S. Dept. of Transportation (available online at https://www.fmcsa.dot.gov/registration/do-i-need-usdot-number; last checked March 28, 2024 (also at Ct. Doc. 33-3)) ("[a]part from federal regulations, some states require their intrastate commercial motor vehicle registrants to obtain a USDOT Number. These states include… Kentucky").

the property or passengers.  The transportation of the property or passengers may include transport by plane, train, or boat in addition to the company's commercial motor vehicle.  For example: if the origination and destination indicated on the bill of lading – when one exists – are not in the same State, then the shipment is interstate and the company needs to be registered as an Interstate Carrier.

The company is also considered to be an Interstate Carrier if the property or passengers being transported will ever do ANY of the following:

- Cross State lines (including a place outside the United States)
- Move from the United States or a U.S. territory to a foreign country, or vice versa
- Have origination and destination points within a State, but pass through another State or foreign country during transport."

Exhibit 120 at 3, ¶ 22; see also Amended Answer, Ct. Doc. 22, at ¶¶ 22-23.  The instructions also specifically noted that the responses "[w]ill determine if this business is regulated by the FMCSA."  Exhibit 120 at 3, ¶ 22.

Beginning (as relevant for purposes of this case) in the year 2016, and again in 2018, 2020 and 2022, Defendant completed Form MCS-150.  See Forms, Ct. Doc. 34-1.  In doing so, when asked its "Company Operations" and to "check all that apply", Defendant checked "Intrastate Non-Hazmat Carrier"; Defendant did not check "Interstate Carrier".  *Id.*; see also Amended Answer, Ct. Doc. 22, at ¶ 31 ("Defendant Ray Jones Trucking did not check the box labeled 'Interstate Carrier.'"); Grant Jones Depo., Exhibit 119, at 24, 26.

Where a carrier/defendant "represented to the FMCSA under penalty of perjury that it and its drivers were not involved in interstate commerce, but instead operated 'intrastate only (non-HM)'", this Court previously correctly held that "the record currently reflects that [the defendant] is not an interstate carrier, not authorized to operate in interstate commerce, and has affirmatively represented to the federal government that it is not operating in interstate commerce…. As a result, [the defendant] is not an interstate 'carrier' eligible to benefit under the MCA exemption to the FLSA."  *McClurg v. Dallas Jones Enterprises Inc.*, No. 4:20-CV-00201-JHM, 2021 WL 5763563,

at *5 (W.D. Ky. Dec. 3, 2021).  In identical manner, here, Ray Jones Trucking itself categorized itself as not an interstate carrier and thus is not eligible to utilize the MCA exemption.

Further, because Defendant acknowledged that it was an "intra-state only" company, Defendant did not apply for or have interstate operating authority.  Grant Jones Deposition, Exhibit 119, at 39-40.  Accordingly, Defendant as a company was legally prohibited from permitting its vehicles to operate in interstate commerce.  *Id.*; 49 C.F.R. § 392.9a.

Notably, Defendant even stated, under penalty of perjury, that it was not an interstate carrier *after* it was sued in this action and *after* Defendant asserted in this action that it was an interstate carrier able to assert the MCA exemption.  Compare Ct. Doc. 34-1 at 2 (April 26, 2022 MCS-150 asserting that Defendant is not an interstate carrier and is instead "intrastate non-hazmat carrier") with Ct. Doc. 22 (Amended Answer acknowledging (at ¶ 31) that Defendant had previously not selected "interstate carrier" on MCS-150 but asserting (at ¶ 109 that "Motor Carrier Exemption" applies); Grant Jones Depo., Exhibit 119, at 61-62.

Thus, all of Defendant's truck driver employees' claims are common because the threshold issue – whether or not Defendant is an interstate carrier able to assert the exemption – has a common answer, which has come out of Defendant's own mouth.  *See Back v. Ray Jones Trucking, Inc.*, No. 422CV00005JHMHBB, 2023 WL 1928307, at *5 (W.D. Ky. Feb. 10, 2023) ("representations Jones Trucking made in the government agency filing regarding whether it was engaged in intrastate or interstate transportation is relevant to the parties' claims and defenses").

Defendant answered in its MCS-150 forms that it was **not** an interstate carrier.  Thereafter, even after this action was filed, and even after its inconsistencies were pointed out in its management's deposition, Defendant has continued to double down on those representations – until the present.  See FMCSA Company Snapshot, Exhibit 121 (April 26, 2022 MCS-150 filing

remains Defendant's last MCS-150 filing as of March 25, 2024); Grant Jones October 16, 2023 Depo., Exhibit 119, at 61-62, Exhibit 119.  Accordingly, all of the class will be able to pursue a unified theory that Defendant is not eligible to assert the MCA exemption because it is not an interstate carrier, has repeatedly represented that it is not an interstate carrier, and has repeatedly declined to correct or even change its previous representations (that it is "intrastate only" and not an interstate carrier).

### 3. Drivers' Claims that Drivers Did Not Drive In Kentucky Loads that Were in the Stream of Interstate Commerce Share Commonality.

However, the carrier asserting that it is an interstate carrier is only the initial part of the Motor Carrier Act exemption analysis; to utilize the exemption, the carrier must also show that drivers it alleges were exempt were in fact "transport[ing] goods in a '"practical continuity of movement" across State lines from the point of origin to the point of departure.'"  *Sec'y of Lab. v. Timberline S., LLC*, 925 F.3d 838, 850 (6th Cir. 2019).

Accordingly, in addition to the drivers sharing a unified argument that Defendant's own representations under penalty of perjury that it was not an interstate carrier were binding and correct, the drivers' claims remain common with respect to the remainder of exemption analysis: Defendant admits that the drivers were hauling loads exclusively in Kentucky, Grant Jones Depo., Exhibit 119, at 28-29, 39, 40, and Defendant's own records establish that the loads being transported qualified as being in the stream of interstate commerce.

Specifically, Defendant's only argument that it is exempt from paying overtime compensation is based on the Motor Carriers Act exemption to the Kentucky Wages and Hours Act.  Defendant's October 28, 2022 Responses to Plaintiff's First Discovery Requests, a copy of which are attached as Exhibit 122, at 2-3.  Notably, Defendant has disclosed only two potential factual circumstances relating to the potentially-interstate nature of the loads being hauled by the

drivers: (A) coal being transported, after it is delivered by Defendant's drivers, by third-partiy rail and barge operators out-of-state and (B) coal being transported to the stockpile of the TVA Paradise Fossil Plant in Drakesboro, Kentucky, and then later, after that plant was shut down, being transported by a different trucking company to a barge facility on Kentucky Lake, from which the coal was shipped to Tennessee.

Crucially, Defendant's factual "defense"[11]– that ACNR coal transported in Kentucky by Defendant's drivers later was transported out of state by third-party rail and barge operators – establishes the commonality of the drivers' claims, rather than establishing that drivers' claims are different.  Defendant says it has no way of itself knowing whether or not ACNR coal its drivers transported went out of state, and that it will need to support its burden of proof with respect to the MCA exemption defense – which is its only defense – with "evidence" from its customer ACNR. Grant Jones Depo at 52, 63-64.

However, ACNR, to the extent that it has any knowledge about the ultimate destination of some portions of the coal, has no knowledge relating to whether any of Defendant's drivers – as opposed to drivers of another trucking company Dallas Jones Enterprises, Inc. – drove any particular load of coal.  See Deposition of Mickey Fitzhugh, excerpts of which are attached as Exhibit 123 (Fitzhugh Depo.), at 28, 51; Fitzhugh Declaration, Exhibit 124, at ¶ 9, 10.  This is because Dallas Jones Enterprises, Inc. (another trucking company owned by the cousins of Defendant's owners[12]) shared the hauling of ACNR coal with Defendant.  Fitzhugh Declaration,

---

[11]     Plaintiff does not, by addressing Defendant's apparent arguments regarding the MCA exemption, admit that any coal driven by any of the drivers did in fact leave Kentucky.  As discussed in the text and admitted by Defendant in its discovery responses, the drivers only transported coal in Kentucky.  If Defendant intends to prove that drivers drove coal within Kentucky that was later transported out-of-state by third parties, the Court should require it, as the employer asserting the applicability of an exemption, to bear the burden of proof on that issue.  *See Sec'y of Lab. v. Timberline S., LLC*, 925 F.3d 838, 850 (6th Cir. 2019).

[12]     Dallas Jones and Ray Jones were brothers.  Dallas Jones started Dallas Jones Enterprises, Inc. (which is a defendant in a separate action pending in this Court – *Back v. Ray Jones Trucking, Inc.*, No. 4:20-cv-201) and Ray

Exhibit 124 at ¶ 9 (coal company contracted with Ray Jones Trucking, which then caused Dallas Jones Enterprises, Inc. to assist in the transportation), Grant Jones Deposition, Exhibit 119 at 18 (companies split "most" coal hauling jobs, although not necessarily evenly); *see McClurg v. Dallas Jones Enterprises Inc.*, 542 F. Supp. 3d 595, 600, 602 (W.D. Ky. 2021) ("it is irrelevant that the coal mine shipped coal to Tennessee and Ohio absent evidence that it hired Dallas Jones to transport that coal for at least one step of the journey").

Of course, as part of its burden of proof, Defendant must not only show that Defendant as a company hauled materials which were in the stream of interstate commerce, but that each driver did so. *See McClurg v. Dallas Jones Enterprises Inc.*, 542 F. Supp. 3d 595, 600, 602 (W.D. Ky. 2021) ("the practical continuity of movement test looks to the driver's actions; any employer actions unrelated to the driver's actions are not relevant"), *citing Morgan v. Gandalf, Ltd.*, 165 F. App'x 425, 433 (6th Cir. 2006) (identifying that a key issue was "whether plaintiff, in the course of performing services for defendants, engaged in interstate transportation").

Further, even if Defendant could somehow fill in this gap, the "proof" from the third parties remains subject to common questions that can and should be resolved in a single action, rather being resolved separately (and potentially inconsistently) in over fifty individual actions. Specifically, Defendant has obtained redacted versions of journals kept by ACNR employee Mickey Fitzhugh (see Exhibit 125 and Exhibit 126), which raise a host of questions (all of which are common amongst all of the class members), including:

> Can Mickey Fitzhugh's journals qualify under F.R.E. 803(6) as "being kept in the course of a regularly conducted activity" of one or more of Fitzhugh's employers (including, from September, 2020 on, ACNR[13]) when Mr. Fitzhugh himself has stated under penalty of

Jones started Ray Jones Trucking, Inc. . – the Defendant in this case. Both brothers are now deceased and descendants of the brothers have ownerships interests in the two companies. Grant Jones Deposition at F at 8, 16-17, 35.

[13]    Fitzhugh's declaration indicates that prior to the September 2020 bankruptcy sale, he was employed from February 2018 to September 2020 by Murray Energy Holdings or one of its subsidiaries. Ct. Doc. 139-1 at 1, ¶ 2-3. Prior to February, 2018, he was employed by Armstrong Energy. *Id* at ¶ 4.

perjury that "ACNR does not have formal business records which succinctly set forth the coal tonnages shipped by Ray Jones Trucking/Clay's Trucking on behalf of Murray Energy/Armstrong Energy which ultimately made their way out of state" and that, while he has kept certain records, he did so "on an informal basis"?  See Fitzhugh Declaration, Exhibit 124 at 10.

Whether Fitzhugh's journals qualify under 803(6) as being "a regular practice of th[e] activity" of Fitzhugh's employers when none of Fitzhugh's employers required Fitzhugh to maintain the journals,[14] and he did so "on an informal basis"?

Whether, even if they otherwise qualify as business records of Fitzhugh's employers, portions of Fitzhugh's journals are inadmissible as containing hearsay-within-hearsay statements, not themselves subject to any hearsay exception, from Fitzhugh's employer's customers and/or rail and barge company regarding transportation of coal out-of-state and/or the intended ultimate destination of the coal?[15]

Do Fitzhugh's journals in fact contain contemporaneously-recorded relevant information relating to the ultimate destination of coal outside of Kentucky, other than information added after the fact for purposes of this litigation?  Compare Exhibit 125 (Declaration of Mickey Fitzhugh dated September 21, 2022 with attached redacted journals for certain periods prior to January 30, 2020) and Exhibit 126 (same journals, produced by Defendant November 3, 2022, with same redactions, but with post-litigation notes added by Fitzhugh regarding the alleged destination of loads for certain periods prior to January 30, 2020)?[16]

If the journals contain contemporaneously-recorded relevant information relating to the ultimate destination of coal outside of Kentucky, can it be deciphered without testimony from Fitzhugh regarding the meaning of the notations?  If not, what will Mr. Fitzhugh say regarding the meaning of the notations?  See Fitzhugh Deposition at 82-84 (describing his process for interpreting the meaning of his notations).

---

[14]    Fitzhugh Deposition at 84-85; see also Fitzhugh Deposition at 85 ("never in my wildest dreams what I done six or seven years ago would be important or have any ramifications to it").

[15]    Fitzhugh Deposition at 63-66 (Fitzhugh acknowledging he got any information about any out-of-Kentucky destination from rail company or customer); Advisory Committee note to Fed. R. Evid. 805 (noting information from patient's wife incorporated into hospital record would be inadmissible unless itself subject to hearsay exception); Graham, Michael H., *Business and Public Records Hearsay Exceptions, Fed. R. Evid, 803(6) and (8); Multiple Level Hearsay, Fed. R. Evid. 805* (August 5, 2018) ("information supplied by an informant" incorporated into a business record must also meet hearsay exception in transmission from informant to declarant generating business record to be admissible, such as if informant is speaking under an excited utterance, referencing Fed. R. Evid. 805).

[16]    Defendant cannot introduce redacted versions of the journals and then attempt to provide substitute evidence about what the redacted material says because, among other things, the substitute evidence would not be the best evidence of the content of the redacted material under F.R.E. 1002 and would further be inadmissible hearsay.  Further, to the extent Defendant seeks to introduce redacted versions of the journals, they are irrelevant to show that coal was in fact transported out-of-state during the period covered because, even if the unredacted versions contained information relevant to the destination of coal, that information is obliterated by the redactions, rendering the redacted version irrelevant (while also highly prejudicial, confusing and prone to abuse).

> Would Fitzhugh's statements – including either as declarant in the journals or at trial – be subject to impeachment (including under Federal Rules of Evidence 407, 613 and otherwise[17]), including on the basis that Fitzhugh is biased towards "Ray Jones Trucking/Clay's Trucking" (A) as a former management employee of Ray Jones Trucking, Inc. (Fitzhugh Deposition at 57-58), which is currently being sued for nonpayment of overtime to its own drivers and hoping to rely upon Fitzhugh's testimony to avoid liability, and (B) as a longtime, good friend of Steve and Grant Jones, owners of Ray Jones Trucking (Fitzhugh Deposition at 59, 72)?

The individual circumstances of individual drivers have nothing to do with any of the above questions, which are all common questions arising from Defendant's assertion that the transportation of coal by Defendant's customer (ACNR and its predecessors – or by third party rail or barge companies arranged by that customer) somehow relieves Defendant of the obligation to pay its drivers overtime compensation. Thus, Defendant's MCA exemption defense enhances commonality amongst the claims of the class (i.e., increases the desirability of a class resolution to the common issues), rather than decreasing it.

Moreover, contrary to Defendant's assertion that they believe information from third parties will show coal the drivers drove was in the stream of interstate commerce (which, as an element of an exemption, is part of Defendant's burden of proof[18]), information from ACNR will further support the commonality of class claims as ACNR's information indicates that there were large periods of time when ACNR had no customers outside of Kentucky and none of its coal was leaving Kentucky. See Fitzhugh Declaration, Exhibit 124 (describing in non-admissible fashion Fitzhugh's conclusion that coal went out-of-state in the years 2016 but ending in 2020, with

---

[17] For discussion of impeachment by bias, see *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prod. Liab. Litig.*, 575 F. Supp. 3d 942, 948 (S.D. Ohio 2021)

[18] *McClurg v. Dallas Jones Enterprises Inc.*, 542 F. Supp. 3d 595, 602 (W.D. Ky. 2021) ("where [Plaintiff] delivered coal to the various loadout facilities, it seems less likely that all coal remained in Kentucky [than in the circumstance where Plaintiff delivered directly to a coal-burning power plant]. But Dallas Jones bears the burden of proving the MCA exemption applies"), citing *Sec'y of Labor v. Timberline South, LLC*, 925 F.3d 838, 850 (6th Cir. 2019) ("[t]he employer bears the burden of proving that it qualifies for a claimed exemption").

numbers for 2020 substantially lower than earlier years); Exhibit 125 and Exhibit 126 (redacted journal entries listing dates when Fitzhugh asserts ACNR shipments went out of state, with last such day being January 29, 2020); Deposition of Mickey Fitzhugh at 56; Deposition of Grant Jones, Exhibit 119, at 51-52, 63-64.

Thus, with respect to the period from early 2020 on, ACNR's alleged information *disproves* the applicability of the MCA exemption, and does so in a way that would benefit all of the drivers in common.  In other words, at all times, ACNR's information shows that none of the loads Defendant's drivers were transporting were in fact in interstate commerce because Defendant's customer, ACNR, itself had only Kentucky customers -- utilities which operate power plants that burn the coal in Kentucky.

Defendant's other "defense" is that coal hauled by Defendant's drivers in Kentucky to the Paradise Fossil Plant  in Drakesboro, Kentucky while it was operating was later – after TVA Paradise shut down – hauled by another company and ended up out of state.  Grant Jones Depo. Exhibit 65-72.  The drivers will appropriately respond not with individualized arguments, but with common factual and legal arguments, including relating to Defendant's burden to prove that the coal moved after TVA Paradise shut down was the same coal Defendant's drivers moved during the class period (as to which Mr. Jones acknowledges "I don't have any way to prove that," Exhibit 119 at 69), as well as regarding the character of the product in question being fundamentally changed by virtue of the coal being received and incorporated into a rotated stockpile intended to be burned on-site, but only later being moved because of the coincidence of the coal plant shutting down after 50 years of operation.  See Grant Jones Depo., Exhibit 119, at 69; TVA page regarding Paradise, attached as Exhibit 127; *McClurg v. Dallas Jones Enterprises Inc.*, 542 F. Supp. 3d 595,

602 (W.D. Ky. 2021) (discussing that delivery of coal to Kentucky coal-burning plant could result in coal being "altered before crossing state lines").

In short, Defendant's MCA exemption assertions make this case even more suitable for class action treatment, as the class's claims, including their response to the MCA exemption arguments of Defendant, turn on common issues of fact and law.

## VI.    Plaintiff's Claims are Typical of the Claims of the Class

Further, Plaintiff's claims are typical of the claims of the class:

> The "typicality" requirement of Rule 23(a)(3) is satisfied where "the claims ... of the representative parties are typical of the claims ... of the class." Fed. R. Civ. P. 23(a)(3). Typicality is met if the class members' claims are "fairly encompassed by the named plaintiffs' claims." *In re Whirlpool*, 722 F.3d at 853 (quotation marks omitted). The representatives' claims are typical if they "arise[ ] from the same event or practice or course of conduct that gives rise to the claims of other class members" and are "based on the same legal theory." *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 618 (6th Cir. 2007) (quotation marks omitted).

*Rapp v. Forest City Techs., Inc.*, No. 1:20-CV-2059, 2021 WL 2982005, at *9 (N.D. Ohio July 15, 2021). Here, Plaintiff Back's claims arise from the same facts as those of the class.  See Exhibits 19 through 21. His overtime hours worked and pay are shown on his daily sheet, just like all other class members, see, e.g., Exhibits 1-18 and 22-117, and his claims, like them, are based on the failure of Defendant's MCA exemption on both prongs of the analysis (i.e., Defendant failing to show either that it itself was an interstate carrier or that the employees were transporting goods that were in the stream of interstate commerce).  In short, Mr. Back's claims are typical of the class.

## VII.    Plaintiff Would Adequately Represent the Class

To meet the adequacy requirement, a class representative "must have common interests with unnamed members of the class;" and "it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel."  *Young v. Nationwide Mut. Ins. Co.*,

693 F.3d 532, 543 (6th Cir. 2012).  Here, these requirements are met.  Plaintiff has vigorously

prosecuted this matter and intends to continue to do so.  See Declaration of Mark N. Foster,

attached as Exhibit 128.

### VIII.   Rule 23(b) is Met; A Class Would Be Superior to Individual Actions.

Finally, a class action would be superior to individual actions.  Indeed,

> The case law expounding upon the reach of the Secretary's jurisdiction and the
> parameters of the de minimis exception, as well as the record before the court, make
> clear that in disputing the issue, the parties would rely upon forms of common
> proof, and that regardless of how the issue is resolved, it would apply to all plaintiffs
> in the same manner, i.e., defendants would either fall under the Secretary's
> jurisdiction with respect to all plaintiffs or would be beyond the Secretary's
> jurisdiction for all plaintiffs. Accordingly, with respect to the first prong of the
> MCA exemption, the court is confident that plaintiffs are similarly situated and that
> common questions will predominate over individualized inquiries.

*Mowdy v. Beneto Bulk Transp.*, No. C 06-05682 MHP, 2010 WL 11706895, at *9 (N.D. Cal. July

8, 2010).[19]  Similarly, here, the claims of the class share common questions, which predominate

over any individualized inquiries, and class adjudication would be far superior than individualized

adjudication.  Indeed, not granting class certification, and conducting fifty-plus trials of the class

members' claims individually would likely create inconsistent adjudications including relating to

such fundamental questions as whether or not (A) Defendant's MCS-150 representations that it

was not an interstate carrier are binding and/or correct, (B) Fitzhugh's journals are admissible, (C)

Defendant's violations were in good faith, (D) the individual defendants controlled Defendant Ray

Jones Trucking, Inc. such that they were joint employers, and (E) any goods its drivers hauled in

---

[19]    *Aguayo v. Oldenkamp Trucking*, No. CV F 04-6279 ASI LJO, 2005 WL 2436477, at *6 (E.D. Cal. Oct. 3, 2005) (in case in which Plaintiff raised FLSA claim and state claim for non-payment of overtime, and Defendant asserted employees were exempt under Motor Carrier's Act exemption, granting Rule 23 class certification and rejecting Defendant's argument that class certification should be denied because factual issues could arise regarding routes individual drivers drove).

the stream of interstate commerce were *de minimis*.  Accordingly, the requirements of Rule 23(b)(1) and (b)(3) are met.

## CONCLUSION

As a class action is appropriate, the Court should certify a Rule 23 class so that the claims of the class may be efficiently adjudicated.


Respectfully submitted,

/s/ Mark N. Foster
Mark N. Foster
Law Office of Mark N. Foster, PLLC
P.O. Box 869
Madisonville, KY 42431
(270) 213-130
MFoster@MarkNFoster.com
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the date indicated on the Court's CM/ECF notice of filing, this document was filed through the Court CM/ECF filing system.

/s/ Mark N. Foster